**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Corbin A McNeill, Jr., | No. CV-23-02481-PHX-SMM |
| Plaintiff, | **ORDER** |
| v. | |
| CP Boulders LLC, | |
| Defendant. | |

Before the Court is Plaintiff's Second Motion for Partial Summary Judgement. (Doc. 37). The Motion is fully briefed. (Docs. 53; 59). For the following reasons, the Court grants in-part, and denies in-part the Motion.

**I.      BACKGROUND**

Since 2011, Plaintiff Corbin McNeill ("Plaintiff") has been a member of The Boulders Club, a private golf and social club located in Scottsdale, Arizona. (Doc. 1-1 at 5). Upon joining The Boulders Club, members receive a Membership Plan, The Boulders Club Membership Agreement and Bylaws ("Membership Agreement" and "Original Bylaws"), and the Rules and Regulations of the Club. (Id. at 4). The documents are collectively referred to as the "Club Documents". (Id. at 5). It is undisputed that the Club Documents constitute a binding, enforceable contract between the members and the ownership. (See Doc. 52).

Defendant CP Boulders LLC ("Defendant") purchased The Boulders in 2015. (Doc. 1-1 at 7–8). When Defendant became owner of The Boulders, Defendant became bound

1  by the obligations of the Membership Agreement. (Id.) On March 10, 2023, Defendant

2  amended the Bylaws ("Amended Bylaws"). (Doc. 54 at ¶ 10). Plaintiff disputes the validity

3  of the Amended Bylaws as a whole, in addition to specific provisions to the Amended

4  Bylaws, leading to the instant lawsuit. The validity of the Amended Bylaws provisions

5  would impact the rights Plaintiff enjoys at The Boulders.

6      Plaintiff filed suit against Defendant in the Maricopa County Superior Court on

7  October 31, 2023, bringing claims for breach of contract. (Doc. 1-1 at 2). Plaintiff alleges

8  that the Amended Bylaws imposed by Defendant violate the Membership Agreement by

9  creating new membership categories and creating materially different rights and privileges

10  of members. (Id. at 14). As well, the Amended Bylaws are alleged to offer new categories

11  of membership with the privileges and benefits previously revoked by Defendant while

12  diminishing Plaintiff's material rights and charging higher fees. (Id. at 15). The Complaint

13  also contains several requests for declaratory judgment on the rights and obligations of the

14  parties.

15      Plaintiff has filed six discrete Motions for Partial Summary Judgment. (See Docs.

16  36; 37; 45; 46; 60; 61). Plaintiff has since withdrawn one of his motions. (Doc. 80). In the

17  Second Motion for Partial Summary Judgment, Plaintiff moves the Court to find that the

18  Defendant breached the Bylaws by failing to engage an agronomic expert in 2017, 2018,

19  2020, 2021, and 2022, and by failing to deliver agronomic reports to the Advisory

20  Committee for those years. Further, Plaintiff moves the Court to find that Section

21  2.1(C)(i)(5) of the Bylaws does not limit the courses to which Defendant's course should

22  be compared to only golf courses where members pay similar dues to Plaintiff.  The Court

23  reviews.

24  **II.     LEGAL STANDARD**

25      A party seeking summary judgment "bears the initial responsibility of informing the

26  district court of the basis for its motion[] and identifying those portions of [the record]

27  which it believes demonstrate the absence of a genuine issue of material fact." Celotex

28  Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is appropriate if the

1    evidence, viewed in the light most favorable to the nonmoving party, shows "that there is

2    no genuine issue as to any material fact and that the movant is entitled to judgment as a

3    matter of law." Fed. R. Civ. P. 56(c). Only disputes over facts that might affect the outcome

4    of the suit will preclude the entry of summary judgment, and the disputed evidence must

5    be "such that a reasonable jury could return a verdict for the nonmoving party." Anderson

6    v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

7    **III.    ANALYSIS**

8    **A. FAILURE TO ENGAGE AN AGRONOMIC EXPERT**

9    Plaintiff moves the Court to narrow the issues in dispute and enter an order finding

10    that the Membership Agreement and Bylaws constitute a valid enforceable contract by and

11    between Plaintiff and Defendant, and Defendant breached the Bylaws by failing to engage

12    an agronomic expert in 2017, 2018, 2020, 2021, and 2022, and by failing to deliver

13    agronomic reports to the Advisory Committee for those years. As an initial matter, it is

14    undisputed that the Membership Agreement and Bylaws constitute a valid enforceable

15    contract between Plaintiff and Defendant. (See Doc. 52). Further, it is undisputed that

16    Defendant did not obtain an agronomic expert report for 2017, 2018, 2020, 2021, or 2022,

17    nor was an agronomic report sent to the Advisory Committee in those years. (Doc. 54 at ¶

18    6-7). Defendant contests the Motion on several grounds.

19    First, Defendant argues that the "expert report requirement is not an essential

20    element of the Bylaws, but merely ancillary to ensuring that the quality of the Golf Course

21    and practice facilities remain 'no less than the current level of excellence.'" (Doc. 53 at 6).

22    Therefore, Defendant reasons, any violation of this requirement is "immaterial and trivial."

23    Id.

24    The Court does not find such argument persuasive. It is not evident the damages

25    Plaintiff seeks by showing Defendant failed to obtain the reports. However, the Partial

26    Summary Judgment Motion seeks only for this Court to find that Plaintiff breached the

27    provision. With this limited scope, the language of the Bylaws is clear. The relevant portion

28    of Section 2.1(C)(i)(5) of the Bylaws provides: "[Defendant] will engage an agronomic

expert no less than once per year to evaluate the condition of the golf courses and confirm that the agronomic practices are consistent with other first-class golf facilities in the Phoenix metropolitan area." (Doc. 38 at ¶ 5). The word "will," like the word "shall," is a mandatory term, unless something about the context in which the word is used indicates otherwise. Nat. Res. Def. Council, Inc. v. James R. Perry, 940 F.3d 1072, 1078 (9th Cir. 2019). The Court finds no context that suggests anything other than the use of "will" as a mandatory, contractual promise. The use of "and" proceeding "confirm" states a second obligation of Defendant ("to confirm that the agronomic practices are consistent with . . ."). This second obligation may be the goal of the first obligation, as argued by Defendant, but it does not alleviate the duty to perform the first obligation, made mandatory by the use of the word "will." Defendant failed to engage an agronomic expert in 2017, 2018, 2020, 2021, and 2022, and failed to deliver a report to the Advisory Committee for those same years. Such failure, without a legally cognizable excuse, is a violation of the plain language of the Bylaws.

Alternatively, Defendant argues that it should be excused for failure to engage an agronomic expert in 2020 and 2021 because doing so was rendered impracticable by reason of the COVID pandemic and resulting lockdowns and restrictions. (Doc. 53 at 5). The doctrine of impossibility of performance provides that if a party's performance is rendered "impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged." Restatement (2nd) of Contracts § 261.

Defendant states that the lack of a global pandemic was a basic assumption upon which the contract was formed. (Doc. 53 at 5). Further, Defendant points to the Declaration of General Manager and Board Member Mr. John Maskovich, who states that there was very little activity at the course in 2020 and 2021, due to COVID-19. (Doc. 54-1 at ¶ 15).

The defense for impossibility requires the showing of "a substantial impediment to [its] performance." VEREIT Real Estate, LP v. Fitness Int'l, LLC, 255 Ariz. 147, 155, ¶¶ 27-28 (App. 2023). Defendant's general reference to the pandemic, without extrapolating

1    further as to how it prevented Defendant from retaining an agronomic expert, does not

2    satisfy this high bar. The only mention of the pandemic, in the declaration, was the

3    statement that "there was limited activity at the Boulders . . . resulting in no agronomic

4    reports for those years." Id. Nor does Defendant articulate an argument that the COVID

5    pandemic alleviated any need for the reports. Therefore, Defendant is not excused for not

6    performing in 2020 and 2021 under a theory of the defense of impossibility. [1]

7    Defendant argues that it should be excused for the failure to produce a report in

8    2022, "because the extensive renovations that the 2019 report recommended were finally

9    able to be done in 2022, which further disrupted the resort and rendered obtaining such

10   report for that year impracticable—although [the agronomic expert] TROON did provide

11   an informal assessment and recommendations." (Doc. 53 at 4). Again, Defendant does not

12   provide an explanation as to how the renovations, which occurred from February 2022

13   through October of 2022, created "a substantial impediment to [its] performance." (Doc.

14   54-1 at ¶ 15). Further, the "informal report," referenced by Defendant, was procured to

15   address "the putting greens and their likelihood of recovery following an apparent

16   misapplication of a specific herbicide." (Doc. 54-2). Such a report is not the promised

17   "agronomic report . . . to evaluate the condition of the golf courses," as it was used for a

18   limited purpose—to evaluate the putting greens after a maintenance mistake. (Doc. 38 at ¶

19   5).[2] Defendant is not excused for failing to procure an agronomic report for 2022, under a

20

21   [1] Defendant's position is further eroded by the fact that golf was declared "an essential business" in Arizona by former Governor Doug Ducey:

22   
23       When the virus forced lockdowns in March, Arizona Gov. Doug Ducey kept golf courses open by declaring them as essential businesses. As part of his executive order, clubs had to close many indoor areas and facilities, but the courses themselves remained open for business.

24

25       For the most part, courses in the state did more than just stay open. Many saw their businesses thrive and even expand in some cases. Several courses have reported an increase in the number of rounds played since the onset of the virus earlier this year.

26

27   Nick Hedges, *Arizona's golf scene thrives during COVID-19 pandemic*, AZBIGMEDIA (Dec. 21, 2020), https://azbigmedia.com/lifestyle/arizonas-golf-scene-thrives-during-covid-19-pandemic/.

28   [2] The report does display a need for agronomic expert reports.

- 5 -

1    theory of the defense of impossibility.

2         Therefore, the Court finds that Defendant was not excused from failing to procure

3    an agronomic report for the relevant years, nor is it excused for failing to provide the report

4    to the Advisory Committee. As such, the Court finds that in so far as the Bylaws promise

5    such actions, the Defendant breached the Bylaws. The measure of damages, if any, is left

6    for another day.

7    **B.  INTEPRETATION OF SECTION 2.1(C)(i)(5)**

8         In its Motion for Partial Summary Judgment, Plaintiff moves the Court to find that

9    Section 2.1(C)(i)(5) of the Bylaws does not limit the courses to which Defendant's course

10   should be compared to golf courses where members pay similar dues to Plaintiff. (Doc. 37

11   at 4). The relevant language of the provision provides: "[t]he quality of the Golf Course

12   and practice facilities shall be no less than the current level of excellence comparable to

13   other first-class golf facilities in the Phoenix metropolitan area." (Doc. 38 at ¶ 5).

14        Plaintiff makes this request pursuant to his declaratory judgment claim, under Count

15   Fourth of his Complaint, which seeks "a judicial determination of the respective rights,

16   obligations, and duties of Plaintiff, on one hand, and [Defndant] on the other hand, under

17   the Club Documents," including a judicial determination that "[Defendant] is required

18   under the Club Documents to maintain the Golf Courses in a manner consistent with other

19   comparable first-class golf facilities." (Doc. 1-1 at 19-20).

20        The declaratory judgment claim was brought under the Arizona's uniform

21   Declaratory Judgments Act. Ariz. Rev. Stat. §§ 12-1831 to 12-1846. However, courts in

22   this district have found that the Federal Declaratory Judgment Act is a procedural statute,

23   and therefore, under the Erie doctrine, Federal courts should apply the Federal Declaratory

24   Act rather than the Arizona uniform Declaratory Judgment Act. LaCross v. Knight

25   Transportation Inc., No. CV-15-00990-PHX-JJT, 2024 WL 249162 (D. Ariz. 2024), citing

26   757BD LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 330 F. Supp. 3d 1153, 1159

27   (D. Ariz. 2016) (internal quotation omitted).

28        The Federal Declaratory Judgment Act provides that "[i]n a case of actual

controversy within its jurisdiction," a court, "upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a) (emphasis added). "The Declaratory Judgment Act was an authorization, not a command. It gave the federal courts competence to make a declaration of rights; it did not impose a duty to do so." Pub. Affairs Assocs., Inc. v. Rickover, 369 U.S. 111, 112 (1962). "Declaratory relief is appropriate (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." Guerra v. Sutton, 783 F.2d 1371, 1376 (9th Cir. 1986) (internal quotations omitted).

The Court finds that Plaintiff's request is premature, and not proper for adjudication, and therefore will exercise its discretion to deny Plaintiff's Motion. At this point, the factual record as to the state of Defendant's course is not developed. Further, the enforceability of Section 2.1(C)(i)(5) is an underlying assumption to Plaintiff's request, an assumption that the Court is not ready to accept.

The provision appears to have an illusory promise nature, resulting from the lack of definition of what a "first-class golf facility" is. The phrase may have many meanings, and may be so vague, as to be unenforceable in a contractual setting. It is clear to the Court that many different factors will go in to determining whether Defendant's course is comparable to other first-class golf farcicalities in the Phoenix metropolitan area. One of those factors could very well be dues. Further, what is a "first-class golf facility" may change year-over-year, adding weight to the view that the term is too vague to be enforceable.

Plaintiff asserts that holding that the standard golf course to serve as a comparison point for Defendant's golf course is not limited to golf courses whose members pay a similar amount in dues to Plaintiff would simplify the litigation, and narrow discovery. Plaintiff is correct in so far as stating that dues cannot serve as a limitation of comparison. Defendant attempts to read "comparable" as an adjective before "first-class golf facilities." However, "comparable" appears before "to." Therefore, the provision reads that the golf

- 7 -

course "shall be . . . comparable to . . . first-class golf courses in the Phoenix metropolitan area," rather than "shall be . . . comparable to . . . [comparable] first-class golf courses."

However, the Court does not find that granting the Plaintiff's Motion would serve to simplify this litigation. Relevant is the Latin maxim, "*lex non cogit ad inutilia*", which translates to "the law does not compel useless things. At this point of the proceedings, the Court finds that articulating interpretations of the Section 2.1(C)(i)(5) may be compelling Defendant to a useless act.

For these reasons, the Court denies Plaintiff's Partial Summary Judgment Motion as it relates to the interpretation of Section 2.1(C)(i)(5).

## IV.    CONCLUSION

For the reasons stated above, the Court grants Plaintiff's Second Partial Summary Judgment, in full. However, as the Court stated above, and will reiterate here, this Order is limited to the scope of the Partial Summary Judgment Motion. The Court finds that Defendant breached Section 2.1(C)(i)(5) of the Bylaws by failing to commission an agronomic report and provide a report to the Advisory Committee in 2017, 2018, 2020, 2021, and 2022. The Court makes no findings on whether such a breach caused recoverable damages. The Court denies Plaintiff's Motion, in-part, exercising its discretion by declining, at this time, to interpret the provision in the manner Plaintiff requests, by issuing an order stating that the golf courses to which Defendant's course should be compared is not limited to those courses whose members pay a similar due structure to Plaintiff.

For good cause shown,

**IT IS ORDERED granting, in-part, and denying, in-part,** Plaintiff's Second Motion for Partial Summary Judgment. (Doc. 37).

Dated this 30th day of July, 2025.

_____
Stephen M. McNamee
Senior United States District Judge

- 8 -