**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Corbin A McNeill, Jr.,<br>Plaintiff,<br>v.<br>CP Boulders LLC,<br>Defendant. | No. CV-23-02481-PHX-SMM<br>**ORDER** |

Before the Court is Plaintiff's Seventh Motion for Partial Summary Judgment. (Doc. 130). Defendant filed a response. (Doc. 163).[1] For the following reasons, the Court grants Plaintiff's Motion.

## I. BACKGROUND

### A. Factual Background

Since 2011, Plaintiff Corbin A. McNeill ("Plaintiff") has been a Premier Golf Member of the Boulders Club. (Docs. 131 ¶¶ 2, 4; 163-1 ¶¶ 2, 4). When Plaintiff's application was accepted, he received, among other documents, a "Membership Plan" summarizing the rights of Boulders Club members ("Members"), and The Boulders Club Membership Agreement and By-laws, Amended and Restated 5/23/08. (Doc. 131 ¶ 5). These documents continued to govern Plaintiff's rights and obligations after Defendant CP Boulders LLC ("Defendant") acquired the Boulders Club in 2015, at which point the By-laws were updated to reflect new ownership but were otherwise unchanged (the "Original

[1] The Court did not permit reply briefs unless the parties could demonstrate good cause. (Doc. 143 at 1).

Bylaws”). (See id. ¶¶ 3, 9-11; Doc. 163-1 ¶¶ 3, 9-11).

The Boulders has two 18-hole golf courses, the “North Course” and the “South Course” (jointly, the “Golf Courses”). (Docs. 131 ¶ 1; 163-1 ¶ 1). As a Premier Golf Member, one of Plaintiff’s protected “Rights of Memberships” under Section 2.1 of the Original Bylaws is the right to use of one of the golf courses designated as the “Member Course.” (Ibid. ¶ 15) (citing Original Bylaws § 2.1(B)(i)). Although Defendant has the right or authority to designate which course is made available for the exclusive use of members pursuant to Section 7.3(B) of the Original Bylaws, that is cabined by section 2.1(A)(i): “[e]ach day, The Boulders staff will designate one of the Golf Courses for the exclusive use of the Members (‘Member Course’).” (Ibid. ¶ 14) (citing Original Bylaws § 2.1(A)(i). The “other Golf Course” is, ipso facto, open for use by others, including guests of the Boulders Resort and members of the public. (See ibid.¶ 16) (citing Original Bylaws § 7.3(D)).

Prior to January 31, 2023, Defendant, Defendant’s predecessor, Plaintiff and the other Members all interpreted § 2.1(A)(i) to generally require Defendant to alternate the designated Member Course between the North Course and South Course on a near-daily basis. (Ibid. ¶¶ 29–35). Defendant and its predecessor consistently represented to Members and prospective members that Golf Memberships, as a key benefit, afforded Members access to both Golf Courses. (Id.) For instance, The Boulders website advertised its Premier Golf Membership as granting “[u]se of both The Boulders’ championship golf courses” through at least 2019, and other promotional materials advertised similar access through at least 2022. (Ibid. ¶¶ 29–31, 34). The same is true for brochures provided by The Boulders to prospective members. (Id. ¶¶ 32-33). In October 2022, The Boulders General Manager John Maskovich represented in an email to the Boulders Members Advisory Committee (“BMAC”) that “Membership of the resort enjoys . . . [a]ccess to two golf courses on alternating basis – Member exclusive play on one course daily.” (Ibid. ¶ 35).

Defendant’s actions, like the actions of its predecessor, aligned with these representations during this period. Prior to February 1, 2023, Members had for decades

enjoyed alternating access to the North Course and South Course. (Ibid. ¶¶ 19–20). For example, Dean Ballard, a Head Golf Professional who has worked at The Boulders since 2000, testified that Boulders had "rotated on a daily basis" between the courses for decades. (Ibid. ¶ 22). Similarly, Boulders' former Membership Director and Director of Club Operations, Brandon Christensen, testified that Boulders alternated the Member-Course designation "[s]ince [he] had worked there" starting in 2016. (Ibid. ¶¶ 24–25). As Mr. Christensen testified, "a big part of setting up the … tee sheet every year was . . . . [m]aking sure that one day members were on north, the next day members were on south." (Ibid. ¶ 24). This daily alternation was so regular and predictable that, as Mr. Christensen testified, staff typically "knew throughout the year … what day members were going to be on north and what days members were going to be on south" based on whether it was "an even day or an odd day." (Ibid.)

The only exception to the practice during this period was for temporary closure for seasonal maintenance or repair. (Ibid. ¶ 21). In Mr. Ballard's words, "We rotated on a daily basis, so that's how it fell throughout the year up until we go into one course for aerification and maintenance in the summertime." (Ibid. ¶ 23). Even these temporary closures were treated as deviations which Members graciously tolerated, rather than as something they had no right to resist. For example, when Defendant reopened both Golf Courses from a partial summer closure in 2022, it announced to Members that "We are excited to be back to all 36 holes open tomorrow," promising that "the regular fully reserved course rotation will begin," and thanking "members who were here over the summer as you were very patien[t] as we had to close holes, [and] share the golf courses with the resort/public . . . ." (Ibid. ¶¶ 27–28).

Over the course of several weeks before formally joining, Plaintiff observed this practice of alternating the Member-Course designation. (Ibid. ¶ 36). This led Plaintiff to believe that his agreement with Defendant's predecessor, and particularly § 2.1(A)(i), required The Boulders to generally alternate the Member-Course designation daily—a belief that Defendant's representations and conduct, year after year, re-affirmed. (Ibid. ¶¶

19, 26, 37).

But all of this changed at the end of January 2023. On January 29, 2023, the Golf Members voted not to approve Defendant's proposed increase to the cap on Golf Memberships under the Original Bylaws. (Ibid. ¶ 38). Two days later, on January 31, Defendant's General Manager John Maskovich announced by email to the Members that, effective the next day, the South Course would "be reserved for resort and retail guests," while the Members would "have the North Course dedicated for play seven days weekly as a member only course." (Ibid. ¶ 39). When this announcement was made, Mr. Christensen knew that "members were going to be upset because we had alternated courses in the past" and that some Members had enjoyed that benefit for decades. (Ibid. ¶¶ 42–44). Mr. Christensen acknowledged that Defendant knew that the Members viewed the alternation right as a valuable part of their Membership. (Ibid.)

Defendant later sent an email indicating that the designation of the North Course as the Member Course would be permanent: "Nothing will change with the use of the south course. No trading courses, the way it is now is the way it will always be." (Ibid. ¶ 41). Since January 31, 2023, Defendant has not alternated the Member-Course designation on a daily basis, and exclusive Member play has with few immaterial exceptions been limited to the North Course. (Ibid. ¶¶ 45–46).

**B. Procedural History**

Plaintiff filed suit against Defendant in the Maricopa County Superior Court on October 31, 2023, bringing claims for breach of contract. (Doc. 1-1 at 2). Plaintiff has filed ten discrete Motions for Partial Summary Judgment. (See Docs. 36; 37; 45; 46; 60; 61; 130; 151; 153; 155). Plaintiff has since withdrawn one of his motions. (Doc. 80). The Court denied Plaintiff's First Motion for Partial Summary Judgment (Doc. 98), granted in-part, and denied in-part, Plaintiff's Second Motion for Partial Summary Judgment (Doc. 103), granted Plaintiff's Fourth Motion for Partial Summary Judgment (Doc. 104), and denied Plaintiff's Fifth Motion for Partial Summary Judgment (Doc. 111).

In Plaintiff's Seventh Motion for Partial Summary Judgment, Plaintiff moves the

Court to enter an order (1) finding that Defendant, by failing to frequently alternate exclusive Member access between the Golf Courses, breached § 2.1(A)(i) of the Original Bylaws and the implied covenant of good faith and fair dealing and (2) declaring, pursuant to Count IV of the Complaint, that that the Original Bylaws require Plaintiff's (and the other Members') exclusive access to the North and South Golf Courses to be alternated, on a daily (or near daily) basis. (Doc. 130).

## II. LEGAL STANDARD

The purpose of summary judgment is "to isolate and dispose of factually unsupported claims." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." In re Oracle Corp. Securities Litigation, 627 F.3d 376, 387 (9th Cir. 2010). "Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial." Id. As the Ninth Circuit has said, "[t]his burden is not a light one." Id. To meet this burden, the "non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." Id. Additionally, parties opposing summary judgment are required to "cit[e] to particular parts of materials in the

record" establishing a genuine dispute or "show[ ] that the materials cited do not establish the absence ... of a genuine dispute." Fed. R. Civ. P. 56(c)(1). A district court has no independent duty "to scour the record in search of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996).

## III. DISCUSSION

Plaintiff moves the Court to enter an order (1) finding that Defendant, by failing to frequently alternate exclusive Member access between the Golf Courses, breached § 2.1(A)(i) of the Original Bylaws and the implied covenant of good faith and fair dealing and (2) declaring, pursuant to Count IV of the Complaint, that that the Original Bylaws require Plaintiff's (and the other Members') exclusive access to the North and South Golf Courses to be alternated, on a daily (or near daily) basis. (Doc. 130).

Plaintiff contends that Defendant's refusal to alternate the Member-Course designation between Golf Courses since January 31, 2023 is a breach of Section 2.1(A)(i) of the Original Bylaws. (Id. at 5). Plaintiff further contends that even if Defendant were to urge that it has any degree of contractual discretion, its intractable failure to exercise that discretion consistently with the representations made by Defendant and the age-old practice of near-daily rotation is a breach of the implied covenant of good faith and fair dealing because it evades the spirit of the bargain and prevents Plaintiff from obtaining the reasonably expected benefits of his bargain. (Id.) In response, Defendant contends that Plaintiff is not entitled to alternating use of The Boulders' two golf courses under the plain meaning of the bylaws. (Doc. 163 at 3-4).

### A. Requirement to Alternate Golf Courses

Plaintiff contends that Section 2.1(A)(i), read by itself and in context with relevant contractual provisions requires Defendant to alternate the Member-Course designation between golf courses each day. (Id. at 5). Plaintiff further contends that extrinsic evidence, including Defendants' promises regarding access to both courses and decades of action in conformity with such promises, further corroborates Plaintiff's right to alternating golf courses. (Id.) In response, Defendant contends that the relevant contractual provisions do not establish that Plaintiff has a right to use alternating golf courses, but, rather, allow The

Boulders to decide which course members can play. (Doc. 163 at 3-4).

1. Section 2.1(A)(i) of the Original Bylaws Requires the Member Course to be Alternated

Written contracts must be read as a whole, and every part interpreted in reference to the whole, with reasonable interpretations given preference. Wapato Heritage, L.L.C. v. U.S., 637 F.3d 1033, 1039 (9th Cir. 2011) (citation modified); See Restatement (Second) of Contracts § 202(2) (A.L.I. 1981). Each section of a contract must be read, giving effect to each section in relation to all parts of the writing to bring harmony. Chandler Med. Bldg. Partners v. Chandler Dental Grp., 175 Ariz. 273, 277 (1993). "As a corollary, the court will not construe one provision in a contract so as to render another provision meaningless." Id.

Here, upon reading the Original Bylaws as a whole, and Section 2.1(A)(i), 7.3(B), and 7.3(D) in reference to the whole, the Court finds that the Original Bylaws gave members access to alternating golf courses.

Section 2.1(A)(i) states that members "shall be entitled to . . . [u]se of one of the Golf Courses." It also provides that The Boulders has the power to decide which course the members can play each day. In this case, section 2.1(A)(i) describes "use rights" to which Golf Members "shall be entitled"—including the right to have Defendant exercise its power to designate either the North Course or the South Course as the Member Course no less frequently than "[e]ach day."

Section 7.3(B), meanwhile, gives Defendant the right to "designate which of the Golf Courses will be available for the exclusive use of the Members and which will be available for the use of the Resort Guests and other individuals and groups as well as the Members." (Docs. 130 at 7; 163 at 4). In other words, Section 7.3(B) contemplates that one course or the other will be set aside for the exclusive use of the Members and gives Defendant discretion to pick the Member-only course on a specific day. (Id.) Section 7.3(D) also recognizes that Defendant may need to close one of the Golf Courses for repair or remodeling and thus consolidate play onto the remaining Golf Course. (Id.)

Despite this contractual language, Defendant contends that "[t]hese provisions

establish unambiguously and conclusively that McNeill does not have a right to use of alternating golf courses under the bylaws, which instead allow The Boulders to decide which course members like McNeill can play." (Doc. 163 at 4). The Court disagrees.

Upon reading the relevant provisions, in context, the Court finds that Section 2.1(A) requires daily or near-daily alternation of the Member-Course designation between the North Course and the South Course. Such a reading is required by the specific use of the phrase "each day" as opposed to, for example, "each month" or "from time to time." Further, interpreting Section 2.1(A)(i) to allow Defendant to quasi-permanently designate one Golf Course as the Member Course would impermissibly render the phrase "each day" mere surplusage. See, e.g., In re Marriage of McCulloch, 546 P.3d 109, 121 ¶ 42 (Ariz. App. 2024) ("A contract should be interpreted, if at all possible, in a way that does not render parts of it superfluous.") (internal quotation omitted)).

Moreover, this reading is strongly suggested under Section 2.1(A)(i) within a list of "Rights of Memberships." "Right" connotes an ability to get or keep something desirable. See Right, Oxford English Dictionary (3d ed. rev. 2010) ("Legal entitlement . . . to have or obtain something, or to act in a certain way; the advantage or profit deriving from this."). If Defendant can maintain the same designation indefinitely, the Members' daily designation "right" under § 2.1(A)(i) is meaningless, valueless, and superfluous. Section 7.3(B) already requires a course to be designated as the Member Course, so a parallel requirement in Section 2.1(A)(i) would afford Golf Members no benefit.

Because the plain text of Section 2.1(A)(i) generally requires daily alternation of the Member Course designation between Golf Courses, yet Defendant failed to provide such access, Plaintiff is entitled to partial summary judgment in his favor.

2. Extrinsic Evidence

Plaintiff also contends that extrinsic evidence shows that the parties intended the Member-Course designation to alternate daily (aside from periods of golf course closure for repairs or other extraordinary circumstances). (Doc. 130 at 8). In response, Defendant contends that the express contractual terms are inconsistent with the alleged course of

performance, so the express terms of the agreement prevail as a matter of law. (Doc. 163 at 3-4). Defendant further contends that the bylaws supersede any alleged representations because of the bylaws' integration clause. (Id. at 5).

"[T]he fundamental goal of contract interpretation is to give effect to the mutual intent of the parties as it existed at the time of contracting." Pauma Band of Luiseno Mission Indians of Pauma & Yuima Rsrv. v. Cal., 813 F.3d 1155, 1165 (9th Cir. 2015). Moreover, under Arizona law, "a court may consider surrounding circumstances, including negotiation, prior understandings, and subsequent conduct." Taylor v. State Farm Mut. Auto. Ins., 854 P.2d 1134, 1139 (Ariz. 1993). Further, courts applying Arizona contract law are not required to find ambiguity in the contractual language before they may entertain extrinsic evidence bearing on the parties' intents. Id. at 1140. Rather, courts are instructed "first [to] consider[ ] the offered evidence and, if [the court] finds that the contract language is 'reasonably susceptible' to the interpretation asserted by its proponent, the evidence is admissible to determine the meaning intended by the parties." Id. Such practice is permissible so long as the evidence "is being offered to explain what the parties truly may have intended." Id.

Additionally, regarding integration clauses, Arizona has adopted the Restatement (Second) of Contracts § 213 (1981) as the "general rule of contract law" regarding integration clauses. Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co., 140 Ariz. 383, 392–93 (1984). Pursuant to the Restatement, even a completely integrated agreement supersedes only prior agreements that are "within [the] scope" of the new contract. Restatement (Second) of Contracts § 213(2). Id. at 397-98. To determine whether an integration clause allows amended bylaws to supersede original bylaws, courts look to "surrounding circumstances, including negotiation, prior understandings, subsequent conduct and the like ... to determine the parties' intent with regard to integration of the agreement. . . ." Id. at 798.

In this case, for decades, Defendant and its predecessor alternated Member access between the Golf Courses on a daily basis. (Doc. 130 at 9). For decades, Defendant and its

predecessor represented to Members and prospective members, including Plaintiff, that Membership in The Boulders afforded access to both golf courses on an alternating basis. (Id.) And for decades, Defendant and its predecessor used this course of performance, these representations and the corresponding understanding they elicited in prospective members—including Plaintiff—to sell memberships in The Boulders Club. (Id.)

For example, Defendant's General Manager's stated in October 2022 that Boulders Members enjoyed exclusive access to "both golf courses on alternating basis . . . one course daily," which can only be a gloss on § 2.1(A)(i). (Id.) Similarly, the Memberships page of The Boulders website touted the Premier Golf benefit of "[u]se of both . . . golf courses," which is rooted in § 2.1(A)(i), just as the Premier Social benefit of "[u]se of both . . . golf courses, subject to a maximum of six rounds per member between October and May" is rooted in the equivalent § 2.2(B)(2). (Id.) The same is true for the brochures Defendant distributed to prospective members. (Id.)

These promises and actions demonstrate that the parties interpreted Section 2.1(A)(i) to require daily alternation. (Id.) The only exceptions to this longstanding course of performance are closures, such as for seasonal maintenance, which are separately authorized under Original Bylaws § 7.3(D) as limited exceptions to the general requirement of regular golf-course alternation. (Id.)

At the same time, Defendant knew, or at the very least had reason to know, of the meaning that Plaintiff and the other Members attached to § 2.1(A)(i). (Id.) Defendant was aware of the terms of the Original Bylaws and Membership Plan, of its own promises guaranteeing Members access to both Golf Courses, and of its corresponding actions to fulfill those promises. (Id. at 9-10). Indeed, Defendant's former Director of Club Operations knew that Defendant's revocation of its previous alternation policy would upset many Members precisely because Defendant's actions and promises had led them to believe that they had a right to daily alternation. (Id. at 10).

Defendant, however, abandoned this long history of performance and promises on January 31, 2023, when it decreed that Members would only have access to the North

Course for play seven days a week. (Id.) Two days earlier, the Golf Members voted against Defendant's request to increase the cap on the number of Golf Memberships. (Id.) And the message to Plaintiff and the other Members included other retaliatory actions, such as the revocation of membership discounts and access to pickleball courts. (Id.) Then, in September 2023, Defendant reaffirmed that it would not alternate courses as it had done for many years, telling Members that "the way it is now is the way it will always be." (Id.).

In response, Defendants do not contest any facts. (See Doc. 163). Defendant only contends that when express contractual terms are inconsistent with an alleged course of performance, the express terms of the agreement prevail as a matter of law under A.R.S. § 47-1303(E) and that an alleged course of performance cannot rewrite a contract's language. (Id. at 4).

Defendant also contends that the bylaws' integration clause, which provides that "[a]ll prior and contemporaneous agreements, representations and understandings of the parties, oral or written, are hereby superseded and merged herein" address the subject at issue in §§ 2.1(A)(i) and 7.3(B) –which golf course Plaintiff is entitled to play – so any alleged representations relied on by Plaintiff allegedly at odds with the bylaws are superseded and disclaimed as a matter of law. (Id. at 5).

The Court disagrees with Defendant's interpretation of the bylaws' integration clause. The Court previously found that material or adverse modification to the Original Bylaws require a majority vote from the Members. (Doc. 104 at 7-8). Section 2.1(A)(i) is a protected right under Original Bylaws Section 7.3(G) and Disputed Bylaws Section 14.6.4, meaning that it cannot be modified without approval of a majority of Members. Changing the meaning of Section 2.1(A)(i) to eliminate alternating courses would materially and adversely modify Plaintiff's rights. (Id.) Here, Defendant did not obtain the required Member vote. Defendant unilaterally, and against the contractually required process, eliminated Plaintiff's right to daily alternation of the Member course. Such modification is material, as it modified Plaintiff's rights. Next, the modification reduced Plaintiff's ability to access one of the two golf courses. Therefore, the Court finds that by

refusing to alternate the Members-only course, Defendant breached its contract with Plaintiff.

**B. Covenant of Good Faith and Fair Dealing**

Plaintiff contends that Defendant's permanent designation of the North Course as the Member Course breaches the duty of good faith and fair dealing. (Doc. 130 at 11). Plaintiff contends that it evades the spirit of the bargain and violates Plaintiff's reasonable expectation of regular access to both Golf Courses based upon historical practice, which, taken alone, is enough to constitute a breach of the implied covenant. (Id.) In response, Defendant contends that the bylaws give it "the unfettered right to designate which course members can play" and Plaintiff's belief that the Member Course alternates daily is unreasonable. (Doc. 163 at 5-6).

Under Arizona law, there is an "implied covenant of good faith and fair dealing in every contract" and is "as much a part of a contract as are the express terms." Bike Fashion Corp. v. Kramer, 46 P.3d 431, 434 ¶ 13 (Ariz. App. 2002) (cleaned up). The implied covenant of good faith and fair dealing "prohibits a party from doing anything to prevent other parties to [a] contract from receiving the benefits. . .of the agreement." Wells Fargo Bank v. Arizona Laborers, Loc. No. 395 Pension Trust Fund, 38 P.3d 12, 28 (Ariz. 2002). A party may breach the implied covenant even in the absence of a breach of an express provision of the contract by denying the other party the reasonably expected benefits of the agreement. Id. at 29–30.

Here, the Court finds that any interpretation that prohibits Plaintiff's right to daily alternation of the Member course violates the implied covenant of good faith and fair dealing. Defendant and its predecessor promised Plaintiff, orally and in writing, by brochure and in emails and through legal documents, that he, as a Premier Golf Member, had a right to use both Golf Courses subject to daily alternation. (Doc. 130 at 11). Defendant honored those regularly renewed promises by consistently alternating, day after day, month after month, and year after year, the Member-Course designation from the North Course to the South Course and back again. (Id.) But Defendant unilaterally took

away Plaintiff's right to alternating golf courses by permanently designating the North Course as the Member Course. (Id.)

In response, Defendant contends that the bylaws give The Boulders the unfettered right to designate which course members can play and that the "implied covenant of good faith and fair dealing cannot directly contradict an express contract term." Bike Fashion Corp., 46 P.3d at 434. But Defendant misstates the law. Defendant did not include the phrase "general rule" in its quotation. (See Doc. 163 at 5). Under Arizona law, "the general rule is that an implied covenant of good faith and fair dealing cannot directly contradict an express contract term." Bike Fashion Corp., 46 P.3d at 434 (emphasis added). At the same time, "Arizona law recognizes that a party can breach the implied covenant of good faith and fair dealing both by exercising express discretion in a way inconsistent with a party's reasonable expectations and by acting in ways not expressly excluded by the contract's terms but which nevertheless bear adversely on the party's reasonably expected benefits of the bargain." Id. at 435 (emphasis added).

It is undisputed that Plaintiff reasonably expected daily alternation of the Member course to have access to play on both courses based on the historical practice of the parties. As previously discussed, the bylaws do not give Defendant the final and controlling decision of an enumerated right in the contract. Accordingly, Defendant violated the covenant of good faith and fair dealing by "exercising express discretion in a way inconsistent with [Plaintiff's] reasonable expectations" when it unilaterally took Plaintiff's right to play both the North and South Courses on an alternating basis. Id.

## IV. CONCLUSION

Accordingly, the Court will grant Plaintiff's Motion for Summary Judgment for the following reasons. First, Section 2.1(A)(i) of the Original Bylaws granted Plaintiff access to both the North and South Course on an alternating basis. Second, extrinsic evidence from the parties' history of performance demonstrate that the parties interpreted Section 2.1(A)(i) to require daily alternation. Third, the bylaws do not give Defendant the unfettered right to designate which course members can play.

The Court grants Plaintiff's Seventh Motion for Partial Summary Judgment, finding that Defendant, by failing to frequently alternate exclusive Member access between the Golf Courses, breached Section 2.1(A)(i) of the Original Bylaws and the implied covenant of good faith and fair dealing and (2) the Original Bylaws require Plaintiff's exclusive access to the North and South Golf Courses to be alternated, on a daily (or near daily) basis.

**IT IS THEREFORE ORDERED granting** Plaintiff's Seventh Motion for Partial Summary Judgment. (Doc. 130).

Dated this 4th day of September, 2026.

Stephen M. McNamee
Senior United States District Judge