**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Corbin A McNeill, Jr.,

Plaintiff,

v.

CP Boulders LLC,

Defendant.

No. CV-23-02481-PHX-SMM

**ORDER**

Before the Court is Plaintiff's Ninth Motion for Partial Summary Judgment. (Doc. 153). Defendant filed a response. (Doc. 165).[1] For the following reasons, the Court grants Plaintiff's Motion.

## I. BACKGROUND

Plaintiff Corbin A. McNeill, Jr. ("Plaintiff") has been a Premier Golf Member of the Boulders Club since 2011. (Docs. 154 ¶¶ 1–2; 165-1 ¶¶ 1–2). When Plaintiff's application was accepted, he received, among other documents, a "Membership Plan" summarizing the rights of Boulders Club members ("Members"), and The Boulders Club Membership Agreement and By-laws, Amended and Restated 5/23/08. (See ibid. ¶¶ 3–5). These documents continued to govern Plaintiff's rights and obligations after Defendant CP Boulders LLC ("Defendant") acquired the Boulders Club in 2015, at which point the Bylaws were updated to reflect new ownership but were otherwise unchanged (the "Original Bylaws"). (See ibid. ¶¶ 6–8). Among Plaintiff's rights as a "Premier Golf

[1] The Court only permitted reply briefs if the parties could demonstrate good cause. (Doc. 143 at 1).

Member" is the exclusive use, with other Members under the Original Bylaws ("Original Members" or "2008 Members"), of the golf course designated for such use by Defendant. (Ibid. ¶¶ 10–12). Under the Original Bylaws, the other golf course at the Boulders (the "Resort Course") is generally available for use for a fee by resort guests and members of the general public. (Ibid. ¶¶ 10–12, 28–29).

The availability of tee times on the golf courses has long been a concern among Golf Members, including Plaintiff. (See ibid. ¶¶ 27, 33). This concern is reflected in Original Bylaws Section 2.1(C), which has been present in substantially the same form since at least 2008 and which is intended to preserve Members' golfing experience as the number of Golf Memberships increased. (See ibid. ¶¶ 13, 25–27). Among other measures, Section 2.1(C) prohibits Defendant from issuing more than 400 Golf Memberships and requires Defendant to help Members to secure last-minute tee times, including last-minute tee times on the Resort Course "on a space-available basis." (Ibid. ¶¶ 13–14). Since Plaintiff became a member, Members have been able to play available tee times on the Resort Course without a fee, whether by making a reservation up to 24 hours beforehand or by making a same-day request at the Golf Pro Shop. (Ibid. ¶¶ 18–19, 46–47). For example, a 2014 brochure provided that Premier Golf Members could "schedule a Tee Time on the Resort Course 24 hours in advance." (Ibid. ¶ 20). Brochures in 2019 and 2022 similarly advertised that "Resort Course tee times" for Premier Golf Members were "available with 24 hour advanced notice." (Ibid. ¶ 22). Plaintiff took advantage of this access several times a season, valued it as an alternative to the Member Course during periods of high demand, and believed that it was required and guaranteed under the Original Bylaws. (Ibid. ¶¶ 25–27).

But on January 29, 2023, the Golf Members voted not to approve Defendant's proposed increase to the cap on Golf Memberships under the Original Bylaws. (Ibid. ¶ 30). Two days later, on January 31, Defendant's General Manager John Maskovich ("Mr. Maskovich") announced by email to the Members that, effective the next day, the South Course would "be reserved for resort and retail guests," and "[s]hould a member wish to

play on the south course, the resort will offer a nominal fee for members to utilize the south course tee times." (Ibid. ¶ 31). This policy was incorporated into Section 3.12.1 of the Disputed Bylaws, which provides in relevant part:

> Subject to availability and demand, the Boulders Manager will make the Resort Course available on designated days to Members who acquired their Memberships after the Effective Date, without the payment of any charges or fees apart from those applicable to play on the Member Course. Original Members may use the Resort Course, depending upon availability and demand, by paying a separate fee as established by The Boulders from time to time.

(Ibid. ¶¶ 35–37). In other words, Plaintiff contends that Defendant took away his right and expressly limited his right to use the Resort Course on a space available basis without a fee, even though Section 2.1(C)(i) of the Original Bylaws is a protected right that cannot be adversely or materially modified without a Member majority vote. (See ibid. ¶ 17 (citing Original Bylaws Section 7.3(G)). Later, Defendant stated that the new practices regarding access to the South Course would remain the same: "Nothing will change with the use of the south course. No trading courses, the way it is now is the way it will always be." (Ibid. ¶ 43).

In June 2024, Mr. Maskovich told David Benham, then the Membership Director, that moving forward: "2008 members must pay the member guest rate if they want to play the south course until further notice. Allowing 2008 members to play the south course day of with no fee will cease immediately. If a member inquires as to why they cannot get a same day or south course reservation the answer should be, 'all other available tee times are held for retail guests.'" (Ibid. ¶ 44 (emphasis in original)).

Since Mr. Maskovich's June 2024 email, Plaintiff and other Original Members have not been allowed to reserve tee times on the Resort (South) Course without paying an additional fee. (Ibid. ¶ 48). On December 7, 2025, at approximately 12:30 p.m., Plaintiff contacted the Golf Pro Shop to inquire if there were any open tee times available on the South Course for that day. (Ibid. ¶ 49). The Golf Pro Shop staff said there were open tee times, but when Plaintiff asked for one of those times, he contends that he was told that he could not play on the South Course because of a policy set by Mr.

Maskovich. (Ibid. ¶¶ 49–50). But Defendant denies that The Boulders or Mr. Maskovich put a policy in place prohibiting Plaintiff from accessing the Resort Course. (Doc. 165-1 ¶ 49).

Defendant contends that Section 2.1(C)(i)(4) of the Bylaws provides that The Boulders will provide members with, "the ability to play the Resort Course on a space available basis as determined solely by the Golf Pro Shop staff." (Id. ¶1). Defendant also contends that the Bylaws give The Boulders discretion in operating the facility where the Bylaws do not contain specifics and provide that "[a]ll decisions of the Board of Directors shall on all questions involving the interpretation or construction of this Agreement, the rights and privileges of the Members under this Agreement, the Membership Plan and the Rules and Regulations." (Id. ¶¶ 2–3).

Plaintiff filed suit against Defendant in the Maricopa County Superior Court on October 31, 2023, bringing claims for breach of contract. (Doc. 1-1 at 2). Plaintiff has filed ten discrete Motions for Partial Summary Judgment. (See Docs. 36; 37; 45; 46; 60; 61; 130; 151; 153; 155). Plaintiff has since withdrawn one of his motions. (Doc. 80). The Court denied Plaintiff's First Motion for Partial Summary Judgment (Doc. 98), granted in-part, and denied in-part, Plaintiff's Second Motion for Partial Summary Judgment (Doc. 103), granted Plaintiff's Fourth Motion for Partial Summary Judgment (Doc. 104), denied Plaintiff's Fifth Motion for Partial Summary Judgment (Doc. 111), granted Plaintiff's Seventh Motion for Partial Summary Judgment (Doc. 167), and denied Plaintiff's Eighth Motion for Partial Summary Judgment (Doc. 168).

## II. LEGAL STANDARD

The purpose of summary judgment is "to isolate and dispose of factually unsupported claims." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Only disputes over facts that might affect the outcome of the suit will preclude the entry of

summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." In re Oracle Corp. Securities Litigation, 627 F.3d 376, 387 (9th Cir. 2010). "Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial." Id. As the Ninth Circuit has said, "[t]his burden is not a light one." Id. To meet this burden, the "non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." Id. Additionally, parties opposing summary judgment are required to "cit[e] to particular parts of materials in the record" establishing a genuine dispute or "show[ ] that the materials cited do not establish the absence ... of a genuine dispute." Fed. R. Civ. P. 56(c)(1). A district court has no independent duty "to scour the record in search of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996).

## III. DISCUSSION

Plaintiff moves the Court to enter an order (1) finding that Defendant, by imposing additional fees for Plaintiff to reserve tee times on the Resort Course on a space available basis, breached Section 2.1(C)(i) of the Original Bylaws and the implied covenant of good faith and fair dealing and (2) declaring, pursuant to Count IV of the Complaint, that the Original Bylaws require Defendant to allow Plaintiff to reserve tee times on the Resort Course one day in advance without the payment of additional fees. (Doc. 153).

**A. Fee for Last-Minute Tee Times on the Resort Course**

1. Section 2.1(C)(i)(4) of the Original Bylaws is Ambiguous

Written contracts must be read as a whole, and every part interpreted in reference to the whole, with reasonable interpretations given preference. Wapato Heritage, L.L.C. v. U.S., 637 F.3d 1033, 1039 (9th Cir. 2011) (citation modified); See Restatement (Second) of Contracts § 202(2) (A.L.I. 1981). Each section of a contract must be read, giving effect to each section in relation to all parts of the writing to bring harmony. Chandler Med. Bldg. Partners v. Chandler Dental Grp., 175 Ariz. 273, 277 (1993). "As a corollary, the court will not construe one provision in a contract so as to render another provision meaningless." Id.

Section 2.1(C)(i) concerns the "Preservation of Golfing Experience." (Doc. 153 at 6). Section 2.1(C)(i) states that "[a]s the number of Golf Memberships increase," the Boulders "shall use its best efforts to provide a 'quality golf experience' (the definition of which shall include but not be limited to the hereinafter set forth factors) for Members. Such efforts will focus on the availability of tee times, the speed of play, the accessibility of the golf-related practice facilities and other aspects pertinent to the golf experience." (Id.) Section 2.1(C)(i) then lists several "factors [that] shall be part of what makes a quality golf experience," which include that "4. The Boulders Club will have systems in place to assist Members looking to secure last-minute tee times. This will be at a minimum, a system managed by the Golf Pro Shop to maximize utilization of tee times on the Member Course and the ability to play the Resort Course on a space available basis as determined solely by the Golf Pro Shop staff." (Id.)

Plaintiff contends that the purpose of Section 2.1(C)(i)(4) and accompanying Section 2.1(C) are to "ameliorate the undesirable effects of an increase in the number of Golf Members by requiring Defendant to preserve a 'quality golf experience.'" (Id. at 7). Plaintiff further contends that part of the solution was to ease excess demand by providing Members with Resort Course tee times that would have otherwise gone unused. (Id.)

Plaintiff disagrees with Defendant's position that it has unlimited ability to impose fees or other limitations on the Members' ability to play the Resort Course renders Section 2.1(C)(i)(4) meaningless because Plaintiff already has the same ability as the public for tee times on the Resort Course. (Id.) Plaintiff argues that charging a fee for such use does not advance the purpose of the provision because the Resort Course would only be an effective substitute for the Member Course if offered on the same terms, charging for the Resort Course would not "maximize. . . the ability to play" because its Members would be more likely in the aggregate to play the Resort course if no fee were charged, and introducing an unprecedented charge to use the Resort Course makes Members' golf experiences worse. (Id. at 7-8).

In response, Defendant contends that nothing in Section 2.1(C)(i)(4), or any other provision of the Bylaws, provides that Member access to the Resort Course will be free. (Doc. 165 at 4). Defendant also contends that there is nothing ambiguous about Section 2.1(C)(i)(4) and that absent ambiguity course of dealing cannot add terms to or modify a contract. (Id. at 6).

Upon reading the relevant provisions, in context, the Court finds that both Plaintiff and Defendant's offered interpretations of Section 2.1(C)(i)(4) are reasonable. Specifically, the provision does not enumerate the specific steps Defendant will take to allow Members to secure last minute tee times. Thus, the Court finds that Section 2.1(C)(i)(4) of the Bylaws is ambiguous as to whether Plaintiff is entitled to play on the Resort Court on a space available basis for last minute tee times without paying an additional fee.

2. Extrinsic Evidence

"Once a contract is determined to be ambiguous, extrinsic evidence may be resorted to for the purpose of ascertaining its real meaning." Associated Students of Univ. of Arizona v. Arizona Bd. of Regents, 584 P.2d 564, 568 (Ariz. Ct. App. 1978). "[T]he fundamental goal of contract interpretation is to give effect to the mutual intent of the parties as it existed at the time of contracting." Pauma Band of Luiseno Mission Indians

of Pauma & Yuima Rsrv. v. Cal., 813 F.3d 1155, 1165 (9th Cir. 2015). Moreover, under Arizona law, "a court may consider surrounding circumstances, including negotiation, prior understandings, and subsequent conduct." Taylor v. State Farm Mut. Auto. Ins., 854 P.2d 1134, 1139 (Ariz. 1993). Further, courts applying Arizona contract law are not required to find ambiguity in the contractual language before they may entertain extrinsic evidence bearing on the parties' intents. Id. at 1140. Rather, courts are instructed "first [to] consider[ ] the offered evidence and, if [the court] finds that the contract language is 'reasonably susceptible' to the interpretation asserted by its proponent, the evidence is admissible to determine the meaning intended by the parties." Id. Such practice is permissible so long as the evidence "is being offered to explain what the parties truly may have intended." Id. Further, "[t]he acts of parties under a contract, before disputes arise, are the best evidence of the meaning of doubtful contractual terms." Associated Students of Univ. of Arizona, 584 P.2d at 568 (citation omitted).

Here, before January 31, 2023, Defendant and its predecessor acted consistently with Plaintiff's view of Section 2.1(C)(i)(4). For years, Defendant and its predecessor had a system in place allowing Plaintiff and his fellow Members to book tee times on the Resort Course 24 hours in advance with no additional fee. (See Doc. 153 at 9). As shown by promotional brochures, Defendant and its predecessor represented to Members and prospective members, including Plaintiff, that membership in The Boulders afforded access to the Resort Course on as much as 24 hours' notice, without mentioning a fee. (See id.)[2] Further, from when Plaintiff joined in 2011 until Defendant announced its new policies in 2023 and 2024, Plaintiff's last-minute requests to use unreserved tee times on the Resort Course were granted and no fee was required. (Id.)

On January 31, 2023, two days after the Golf Members voted against Defendant's request to increase the cap on the number of Golf Memberships, Defendant informed Plaintiff and the Members that the South Course would be reserved for resort guests and if any members wished to play the South Course, they would have to pay a fee to secure a

[2] The advertisements also state when access to a golf course requires payment of a guest fee. (See Doc. 154 ¶¶ 21, 23).

tee time. (Id.) Defendant soon created new Bylaws that would require Original Members to pay a fee if they wanted to have access to the Resort Course on a space-available basis. (Id. at 10). In September 2023, Defendant reaffirmed that it would not change its newly announced policies regarding use of the South Course (which has been designated as the Resort Course since January 2023), telling Members that "the way it is now is the way it will always be." (Id.) And in June 2024, Mr. Maskovich instructed staff that employees could not allow Original Members to play the South Course without paying a guest fee and to tell Members that available tee times are reserved for retail guests. (Id.) Although before January 2023, Plaintiff had been able to secure tee times on the Resort Course with no additional fee, Plaintiff was recently told that under Mr. Maskovich's direction, he could not play any of the available slots for the Resort Course that day. (Id.)

In response, Defendant contends that Plaintiff points to nothing in the record in which he was told he would have access to the Resort Course without paying a fee and that Plaintiff relies on "extraneous materials" that do not support his position. (Doc. 165 at 5).

The Court disagrees with Defendant that Plaintiff presents insufficient evidence in support of his position. Defendant does not dispute any material facts in Plaintiff's Motion. See Celotex, 477 U.S. at 323 ("a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. . . . [and] [t]he moving party is 'entitled to a judgment as a matter of law[.]'"). Further, "[t]he acts of parties under a contract, before disputes arise, are the best evidence of the meaning of doubtful contractual terms." Associated Students of Univ. of Arizona, 584 P.2d at 568. The record demonstrates that all of Defendant's conduct before Section 2.1(C)(i)(4) of the Bylaws was in dispute comport with Plaintiff's interpretation that he is entitled to book tee times for the Resort Course up to 24 hours in advance without payment of an additional fee.

Accordingly, the Court finds that Plaintiff is entitled to partial summary judgment on Count III, ruling that Defendant breached the Club Documents by refusing to allow

him to book tee times for the Resort Course up to 24 hours in advance without payment of an additional fee, with the issue of damages or injunctive relief to be handled at a future date. Plaintiff is also entitled to a judicial declaration under Count IV that he has the right, under Section 2.1(C)(i)(4), to secure last minute tee times on the Resort Course without paying an additional fee.

**B. Covenant of Good Faith and Fair Dealing**

Under Arizona law, there is an "implied covenant of good faith and fair dealing in every contract" and is "as much a part of a contract as are the express terms." Bike Fashion Corp. v. Kramer, 46 P.3d 431, 434 ¶ 13 (Ariz. App. 2002) (cleaned up). The implied covenant of good faith and fair dealing "prohibits a party from doing anything to prevent other parties to [a] contract from receiving the benefits. . .of the agreement." Wells Fargo Bank v. Arizona Laborers, Loc. No. 395 Pension Trust Fund, 38 P.3d 12, 28 (Ariz. 2002). A party may breach the implied covenant even in the absence of a breach of an express provision of the contract by denying the other party the reasonably expected benefits of the agreement. Id. at 29–30.

Here, Plaintiff contends that to the extent that Defendant has discretion regarding how to implement systems to "assist Members looking to secure last minute tee times" and "maximize . . . the ability to play the Resort Course on a space available basis," Defendant's new policy requiring the payment of guest fees in order to play on the Resort Course breaches the duty of good faith and fair dealing. (Doc. 153 at 11). Plaintiff contends that it evades the spirit of the bargain and violates his reasonable expectation of regular access to the Resort Course for last-minute tee times without a fee based upon historical practice, which, taken alone, is enough to breach the implied covenant. (Id.)

In response, Defendant argues that the benefit to which Plaintiff is entitled to is the ability to book available tee times on the Resort Course, and that requiring him to pay a fee is consistent with the Bylaws and does not prevent him from receiving the benefits of the agreement. (Doc. 165 at 7).

But as discussed above, it is undisputed that Plaintiff reasonably expected to be

able to book last minute tee times on the Resort Course without incurring an additional fee based on the historical practice of the parties. Also, the Bylaws do not give Defendant the final and controlling decision to charge Plaintiff a few for last minute tee times on the Resort Course. Accordingly, the Court finds that Defendant violated the covenant of good faith and fair dealing by "exercising express discretion in a way inconsistent with [Plaintiff's] reasonable expectations." Bike Fashion Corp., 46 P.3d at 435. But the Court will not rule on whether Defendant used its "best efforts" because what constitutes "best efforts" is a question for a factfinder at trial. See Maxim Integrated Prods., Inc. v. Analog Devices, Inc., 79 F.3d 1153, at *3 (9th Cir. 1996).

## IV. CONCLUSION

The Court will grant Plaintiff's Ninth Partial Motion for Summary Judgment because Section 2.1(C)(i)(4) of the Original Bylaws granted Plaintiff the right to reserve last minute tee times on the Resort Course without incurring an additional fee based on the historical practice of the parties. Accordingly, the Court finds that Defendant breached the Club Documents by refusing to allow him to book tee times for the Resort Course up to 24 hours in advance without payment of an additional fee.

**IT IS THEREFORE ORDERED granting** Plaintiff's Ninth Motion for Partial Summary Judgment. (Doc. 153).

Dated this 16th day of September, 2026.

Stephen M. McNamee
Senior United States District Judge